912 So.2d 400 (2005)
BROADMOOR ANDERSON, A Joint Venture Consisting of Roy Anderson Corp. and Broadmoor, A Louisiana Partnership, Plaintiff-Appellee
v.
NATIONAL UNION FIRE INSURANCE COMPANY OF LOUISIANA, Defendant-Appellant.
No. 40,096-CA.
Court of Appeal of Louisiana, Second Circuit.
September 28, 2005.
Rehearing Denied October 20, 2005.
*401 Gieger, Laborde & Laperouse, LLC, by Robert I. Siegel, New Orleans, Adams & Reese, L.L.P., by Louis C. LaCour, Jr., Raymond P. Ward, New Orleans, for Appellant.
Wiener, Weiss & Madison, by John M. Madison. Jr., and M. Allyn Stroud, Shreveport, Cokinos, Bosien & Young, by Patrick J. Wielinski for Appellee.
*402 Before STEWART, CARAWAY and PEATROSS, JJ.
CARAWAY, J.
This insurance coverage dispute concerns a general contractor which was a named insured under a Commercial General Liability ("CGL") policy concerning a hotel construction project. Following the project's completion, the showers in some of the hotel rooms which had been installed by a subcontractor began leaking, causing damage and the eventual repair and replacement of all shower facilities. After the general contractor repaired the hotel rooms, it brought this action against the CGL insurer which denied coverage. Following the general contractor's motion for partial summary judgment which established the subcontractor's defective work, the trial court rendered a partial summary judgment on the issue of policy coverage, prompting the insurer's appeal. For the following reasons, we affirm the partial summary judgment.

Facts
Appellee, Broadmoor Anderson Corp. ("BRAC"), was the general contractor for Hollywood Casino Shreveport ("Hollywood") for the construction of the Hollywood Hotel and Casino on the Shreveport riverfront. Construction began in August 1999, and the $70 million hotel portion was substantially completed on December 15, 2000.
During construction, BRAC subcontracted with Tiede-Zoeller Inc. ("T-Z") for more than $4 million worth of ceramic tile and stone work on the project, including the hotel guestroom showers. After the opening, hotel staff and maintenance personnel noticed problems with the shower stalls. The leaking water damaged the interior finishes, drywall, floors and carpets in some rooms.
Hollywood formally notified BRAC of the problem on September 12, 2001, and commissioned a study from the Ceramic Tile Institute of America, Inc. ("CTI"). CTI's analysis concluded the problem was not a design defect, but specifically due to the subcontractor's defective workmanship installing the guest room shower pans. In particular, the assessment portion of the report concluded after destructive testing that the waterproof membrane portion of the shower pans lacked the proper slope for drainage, resulting in both the shower pans themselves leaking and the gypsum wallboard surrounding the shower assemblies retaining moisture. The report recommended removing and replacing all of the shower pan assemblies down to the structural slab and up to 4" above the existing finished curb.
In conjunction with the hotel construction project, Hollywood had obtained a CGL policy of insurance from National Union Fire Insurance Company of Louisiana ("National Union"). By endorsement, the Named Insured for the policy was expanded to include in addition to Hollywood, "all contractors, all tiers of subcontractors," which included both BRAC and T-Z. The CGL policy provisions at issue are set forth in Appendix A attached to this opinion.
In August 2002, BRAC made a formal demand for coverage under the CGL policy, arguing that "the work out of which the damage arises was clearly performed by BRAC's subcontractor, Tiede-Zoeller, Inc." The letter alleged that T-Z's repairs began on a staggered basis after May 20, 2002, and 350-plus guestroom showers potentially needed repair.
In 2003, BRAC sued National Union for coverage for repayment of the sums it paid to Hollywood and T-Z in the repair of the hotel. It alleged that as general contractor, it was obligated to repair defective *403 workmanship performed on the project, including the work of its subcontractor. By endorsement to the policy, the Products Completed Operations coverage of the policy extended for a period of seven years after substantial completion of the project.
National Union answered, denying coverage. Thereafter, BRAC moved for summary judgment, alleging total damages of $1,464,934.26 for the costs of repairing the shower assemblies.
The affidavit of BRAC's project manager filed in support of its motion for summary judgment alleges that "Hollywood undertook repairs of the shower assemblies by contracting with Andrews Flooring of Shreveport, Louisiana, with reimbursement of Hollywood's costs paid by BRAC. After issuance of the CTI report attributing the leaks to defective installation of the water resistant membranes, Tiede-Zoeller agreed, on a time and materials (at cost) basis, to perform the repairs to the shower pans in its overall effort to mitigate damages for all concerned." Nevertheless, BRAC funded the repair work of T-Z and seeks reimbursement for its payments to T-Z as part of its claim. The affidavit breaks down BRAC's costs associated with the repair of the shower assemblies as follows:

 Contract Labor $ 1,403.90
 Labor 99,282.70

 Burden 38,989.13
 Materials 230,594.64
 Subcontractor Costs 377,303.90
 Sales Taxes 142.08
 Hollywood Charge for Lost Revenue 496,225.00
 Hollywood Andrew's Flooring Costs 24,400.00
 ______________
 1,268,341.35
 Overhead @ 10% 126,834.14
 Profit @ 5% 69,758.77
 _______________
 $ 1,464,934.26
 ===============

National Union filed its cross-motion for summary judgment. In its motion and its opposition to BRAC's motion, National Union did not dispute the deficiency of T-Z's work as shown by the CTI report. Neither did National Union contest that BRAC had reimbursed Hollywood for the damages.
After due proceedings, the trial court granted judgment on BRAC's motion for partial summary judgment on the issue of coverage and denied National Union's cross-motion for summary judgment. The partial judgment was certified for immediate appeal.
On appeal, National Union asserts that no occurrence or accident under the terms of the CGL has occurred. Alternatively, National Union argues that certain policy exclusions deny or limit coverage.

Law
A reviewing court examines summary judgments de novo under the same criteria that govern the district court's consideration of whether summary judgment is appropriate. Robinson v. Heard, 01-1697 (La.2/26/02), 809 So.2d 943; Harrison v. Morrison & Son, Inc., 37,992 (La. App. 2d Cir.12/10/03), 862 So.2d 1065, writ denied, 04-101 (La.3/19/04), 869 So.2d 857; Finnie v. LeBlanc, 03-457 (La.App. 3d Cir.10/1/03), 856 So.2d 208, writ denied, 03-3333 (La.3/19/04), 869 So.2d 849; Miller v. Superior Shipyard & Fabrication, Inc., 01-2907 (La.App. 1st Cir.8/20/03), 859 So.2d 159, writ denied, 03-2643 (La.12/12/03), 860 So.2d 1159. A reviewing court thus asks the same questions as does the trial court in determining whether summary judgment is appropriate: whether there is any genuine issue of material fact, and whether the mover is entitled to judgment as a matter of law. Robinson v. Heard, supra; Smith v. Williams, 03-433 (La.App. 1st Cir.5/14/04), 879 So.2d 233; Harrison v. Morrison & Son, Inc., supra; Finnie v. LeBlanc, supra. Interpretation of an insurance contract is usually a legal question that can be properly resolved in the framework of a motion for summary judgment. Robinson v. Heard, supra; *404 Smith v. Williams, supra; Harrison v. Morrison & Son, Inc., supra; Miller v. Superior Shipyard & Fabrication, Inc., supra.
An insurance contract is an aleatory, nominate contract subject to the general rules of contract interpretation as set forth in our civil code. The extent of coverage under an insurance contract is dependent on the common intent of the insured and insurer. La. C.C. art. 2045; Succession of Fannaly v. Lafayette Ins. Co., 01-1144, 1343, 1355, 1360 (La.1/15/02), 805 So.2d 1134. Words in an insurance contract must be ascribed their generally prevailing meaning unless the words have acquired a technical meaning. La. C.C. art. 2047; Succession of Fannaly, supra. An insurance contract is to be construed as a whole and each provision interpreted in light of the other provisions. La. C.C. art. 2050; Succession of Fannaly, supra. When the words of the insurance contract are clear and explicit and lead to no absurd consequences, courts must enforce the contract as written. La. C.C. art. 2046; Succession of Fannaly, supra; Gaylord Chemical Corp. v. ProPump, Inc., 98-2367 (La.App. 1st Cir.2/18/00), 753 So.2d 349. If an ambiguity remains after applying the general rules of contract interpretation to an insurance contract, the ambiguous contractual provision is interpreted against the insurer who furnished the contract's text and in favor of the insured. La. C.C. art. 2056; Succession of Fannaly, supra; Oxner v. Montgomery, 34,727, 34,766 (La.App. 2d Cir.8/1/01), 794 So.2d 86, writ denied, 01-2489 (La.12/7/01), 803 So.2d 36. If the language of the exclusion is subject to two or more reasonable interpretations, the interpretation which favors coverage must be applied. Garcia v. St. Bernard Parish School Bd., 576 So.2d 975 (La.1991).
Exclusionary provisions in insurance contracts are strictly construed against the insurer and any ambiguity is construed in favor of the insured. Garcia v. St. Bernard Parish School Bd., supra; Oxner v. Montgomery, supra; Gaylord Chemical Corp. v. ProPump, Inc., supra. The insurer has the burden of proving that a loss comes within a policy exclusion. Blackburn v. Nat'l Fire Ins. Co. of Pittsburgh, 00-2668 (La.4/3/01), 784 So.2d 637; Gottsegen v. Hart Property Management, Inc., 02-129 (La.App. 5th Cir.5/29/02), 820 So.2d 1138; Dawson Farms, L.L.C. v. Millers Mutual Fire Ins. Co., 34,801 (La.App. 2d Cir.8/1/01), 794 So.2d 949; Norwood v. Van Veckhoven, 34,891 (La.App. 2d Cir.6/22/01), 792 So.2d 836.

Discussion
As a matter of first importance, since both BRAC and T-Z are insureds under the policy, it is significant to note which of the insured's liability will be tested for coverage. In its first assignments of error dealing with the broad grant of coverage of the CGL policy for an "occurrence," National Union articulates the issues presented as follows:
Does this grant of coverage encompass BRAC's bargained-for contractual obligation to repair its own or its subcontractor's defective work?
When the insured is obligated to repair its own work, due to its own (or its subcontractor's) sloppy workmanship, has an insured accident occurred?
Accordingly, from National Union's own view of the case, BRAC's obligation to Hollywood under the general construction contract and its liability under that contract will be the focus of the coverage review.

*405 Has an Insured Accident Occurred?

National Union first disputes that the general grant of coverage of the CGL was intended to cover liability for the breach of BRAC's construction contract with Hollywood. Since a contractual obligation was breached, it contends that an insured accident has not occurred.
Examination of the language of the insuring agreement of the CGL reveals that coverage is extended to BRAC for the sums it "becomes legally obligated to pay" for "property damage" when "caused by an `occurrence.'" Occurrence is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." Here, the undisputed conduct which is claimed as accidental is T-Z's deficient workmanship for the shower pan installations which caused repeated damage to the hotel from leaking water. This conduct gave rise to BRAC's contractual responsibility as the general contractor for Hollywood.
This policy language for the CGL grant of coverage does not make any express distinction between tort or contractual liability. While the term "accident" may imply a tortious event, T-Z's deficient conduct, unexpected and with lack of foresight, can also be considered accidental. Moreover, any ambiguity regarding the scope of the term, occurrence/accident, is clearly resolved by review of the policy as a whole. La. C.C. art. 2050.
In the "Limits of Insurance" section of the CGL, the Products-Completed Operations protection is extended "for damages because of . . . `property damage' included in the `products-completed operations hazard.'" Although this language is not contained in the insuring agreement, it reflects that this protection is part of the coverage extended by the insuring agreement and sets a specific limit of liability. The products-completed operations hazard is defined to include property damage occurring off the insured's premises "arising out of `your product' or `your work'" except for "work that has not yet been completed or abandoned." The definition of "your work," which in this case is BRAC's work as an insured, describes "work or operations performed by you or on your behalf." T-Z clearly performed and completed work on BRAC's behalf as a subcontractor. The completed work of both BRAC and T-Z is therefore a focus of the products/work completed operations coverage which was extended for a period of seven years after acceptance of the hotel project by Hollywood. Although a collapse of a building structure long after completion of the project might cause bodily injury to a third party and be a covered accident arising in tort, the contemplated hazard as defined in the policy also indicates coverage for property damage relating to the deficient performance of the contractor that harms the structure and its owner and therefore entails a contractual breach. Also, there is no limitation in all the provisions discussed so far regarding who may suffer damage and be a beneficiary of the policy coverage, whether a third party or the insured's contracting partner.
While the overall coverage for contractual liability for property damage is apparently reined in drastically by the policy exclusions[1] which we will next review, the *406 general grant of coverage is not limited to only claims in tort. The policy addresses a "hazard" or risk connected to the insured's work on a construction project that remains for seven years after the work is completed. This contemplates action or inaction at one point in time during the construction phase that may not cause damage immediately. Through repeated exposure at another point in time, the damage arises. This clearly suggests that an accident as contemplated by the policy occurred in this case and that BRAC's ongoing contractual liability is covered.
Our interpretation of occurrence/accident in this CGL policy is supported by decisions of this court and other Louisiana cases which involved the same or similar policy language in contractual settings. Oxner v. Montgomery, supra; Joe Banks Drywall & Acoustics, Inc. v. Transcontinental Ins. Co., 32,743 (La.App.2d Cir.3/1/00), 753 So.2d 980; Gaylord Chemical Corp. v. ProPump, Inc., supra; Iberia Parish School Bd. v. Sandifer & Son Construction Co. Inc., 98-319 (La.App. 3d Cir.10/28/98), 721 So.2d 1021; Korossy v. Sunrise Homes, Inc., 94-473 (La.App. 5th Cir.3/15/95), 653 So.2d 1215; Riley Stoker Corp. v. Fidelity and Guaranty Ins. Underwriters, Inc., 26 F.3d 581 (5th Cir. 1994). Also, the Louisiana commentary on the scope of occurrence/accident for claims of construction defects has observed:
Several cases have suggested that, when the liability of a contractor is based solely on improper construction, there is no occurrence. Whether there has been an occurrence, however, depends upon whether there has been an accident, not upon the legal cause or consequences of that accident.
McKenzie and Johnson, Insurance Law and Practice § 183, in 15 Louisiana Civil Law Treatise (1996).
In reaching this conclusion, we acknowledge other rulings and dicta in the jurisprudence interpreting occurrence/accident to exclude damages that arise from the improper construction work of the insured. Lewis v. Easley, 614 So.2d 780 (La.App. 2d Cir.1993); Swarts v. Woodlawn, Inc., 610 So.2d 888 (La.App. 1st Cir.1992); Carpenter v. Lafayette Woodworks, Inc., 573 So.2d 249 (La.App. 3d Cir.1990); Fredeman Shipyard, Inc. v. Weldon Miller Contractors, Inc., 497 So.2d 370 (La.App. 3d Cir.1986); Vitenas v. Centanni, 381 So.2d 531 (La.App. 4th Cir.1980); Vobill Homes, Inc. v. Hartford Accident & Indemn. Co., 179 So.2d 496 (La.App. 3d Cir. 1965). The entire contractual language of those disputed policies is not always clear from the opinions, and we are required here to deal with the precise language at hand in the context of the entire policy. In reading this contract as the law between these parties, we find that an insured accident occurred as the result of T-Z's faulty workmanship which was performed on behalf of BRAC.

Does the Policy Exclusion for Assumed Liability Apply?
National Union next argues that policy exclusion (b) applies to exclude coverage for BRAC's liability under its contract with Hollywood. That provision states that when "the insured is obligated to pay damages by reason of the assumption of liability in a contract," coverage is excluded under the policy. National Union argues that in BRAC's contract with Hollywood, BRAC expressly obligated itself as follows:
"The Contractor [BRAC] shall be responsible to the Owner [Hollywood] for *407 acts and omissions of ... Subcontractor [T-Z]...."
According to National Union, this was an assumption of BRAC's subcontractor's liability which is precisely what is contemplated by coverage exclusion (b). We disagree.
The "assumption of liability" language of exclusion (b) has been argued by insurers to broadly exclude coverage for the liability under any contract of the insured. As that argument goes, in any contractual undertaking, the insured/contracting party assumes a contractual obligation of performance, and liability from non-performance is excluded from CGL coverage. This broad interpretation of the "assumption of liability" exclusion has been rejected by the courts. Doucet v. Huffine Roofing & Constr., 02-1049 (La.App. 5th Cir.2/25/03), 841 So.2d 916; Federated Mutual Ins. Co. v. Grapevine Excavation, Inc., 197 F.3d 720 (5th Cir.1999); Musgrove v. Southland Corp., 898 F.2d 1041 (5th Cir.1990); Olympic, Inc. v. Providence Washington Ins. Co. of Alaska, 648 P.2d 1008 (Alaska 1982); American Family Mut. Ins. Co. v. American Girl, Inc., supra. National Union acknowledges this jurisprudence and does not make such a broad assertion of the scope of this exclusion.
From our review of the above cited cases and the policy language, we agree that the concept of assumed liability in exclusion (b) does not apply to all of BRAC's contractual obligations undertaken in connection with the Hollywood hotel project identified in the policy. A second, reasonable and more narrow interpretation would limit this concept to a specific assumption by the insured of liability that solely results from the negligence or contractual breach of a third party. This more narrow view is described as addressing an insured's agreement to hold a third party harmless or to provide indemnification to the third party.
With this view of exclusion (b), the question becomes whether the failure of performance regarding the shower pan installations represents BRAC's failed obligation owed directly to Hollywood or T-Z's failed obligation to Hollywood for which BRAC provided T-Z indemnification. Clearly, in BRAC's general construction contract with Hollywood, BRAC first obligated itself directly for the entire project including the construction of the showers. Whether the work would be performed through BRAC's separate contracts with its employees/agents or its subcontractors, BRAC was obligated directly to Hollywood which had no contractual privity with those employees/agents or subcontractors. Thus, the failure of performance regarding the shower installations represents BRAC's failed performance under its contract with Hollywood. This does not comport with the concept of indemnification which is the focus of exclusion (b). The liability did not arise by a contract or otherwise, directly and solely between T-Z and Hollywood, with a separate agreement by BRAC for indemnification to T-Z. Accordingly, exclusion (b) is inapplicable.
In reaching this conclusion, we observe that National Union does not raise the application of another policy exclusion which has been the focus of coverage disputes for other failures of performance by subcontractors. Exclusion (l), the "Damages to Your Work" exclusion, is never urged by National Union. The provision excludes property damage coverage for "`your work' that is defective or actually malfunctions" and states that it "applies only to the `products-completed operation' hazard." Nevertheless, this property damage exclusion further states, "if the damaged work or the work out of which *408 the damage arises was performed on your behalf by a subcontractor," the exclusion is inapplicable. Thus, while the "your work" exclusion would broadly exclude property damage (as opposed to "bodily injury") arising from the insured's own defective work on a construction project, an insured/general contractor which experiences the unanticipated risk of its subcontractor's defective work remains covered for that risk under the products-completed operations coverage. Accord, Iberia Parish School Bd. v. Sandifer & Son Construction Co., Inc., supra.

Do Exclusions (m) and (n) Apply?
As an alternative argument, National Union asserts that a partial summary judgment should have been granted in its favor interpreting exclusions (m) and (n) to limit the amount of damages claimed by BRAC. These exclusions relate to "impaired property" as defined in the policy or property that has not been physically injured for which the claimed damages relate primarily to the loss of use of that property. See, Gaylord Chemical Corp. v. ProPump, supra at 355. National Union does not assert that these exclusions bar BRAC's recovery under the policy for all of its claimed damages.
The trial court's partial summary judgment in favor of BRAC addressed coverage under the CGL policy. The issues of the amount of damages and the fixing of a money judgment against National Union were not the subject of the partial summary judgment and remain for trial. The arguments now raised by National Union are based upon its conjecture that a certain percentage of the shower pans throughout the hotel did not leak and would have never leaked. It also asserts that much of the claimed damages relate to the loss of use of undamaged property which is the subject of these exclusions. Since this may be relevant to the application of exclusions (m) and (n), we find that material fact issues remain concerning the extent of damages requiring that these policy exclusions be addressed along with the overall quantum issues by the trial court. Accordingly, the trial court's denial of National Union's motion for summary judgment is affirmed.

Conclusion
Based upon our review and interpretation of the CGL policy, the trial court's grant of partial summary judgment in favor of BRAC is affirmed. Costs of appeal are assessed to National Union.
AFFIRMED.
APPLICATION FOR REHEARING
Before STEWART, GASKINS, CARAWAY, PEATROSS, and MOORE, JJ.
Rehearing denied.
GASKINS and MOORE, JJ., would grant rehearing.

Appendix A

No. 40,096-CA
National Union's CGL policy for Hollywood's construction project covered between August 11, 1999, and August 11, 2000, and provides in pertinent part as follows:
*409 COMMON POLICY DECLARATIONS NAMED INSURED [by applicable endorsement]
1. The Sponsor  Hollywood Casino Shreveport, Hollywood Casino Corporation, HCS I, Inc., HCS II, Inc., HWCC  Louisiana, Inc., HWCC  Shreveport, Inc., Shreveport Capital Corporation.
* * *
2. All contractors, all tiers of subcontractors, each separate contractor of Hollywood Casino Shreveport others to whom Hollywood Casino Shreveport contracts to furnish insurance under the insurance program for this project but excluding vendors, suppliers, material dealers and others who merely make deliveries to or from the Project Site.
SECTION V  DEFINITIONS
7. "Impaired Property" means tangible property other than "your product" or "your work", that cannot be used or is less useful because:
a. It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or
b. You have failed to fulfill the terms of a contract or agreement;
If such property can be restored to use by:
a. The repair, replacement, adjustment or removal of "your product" or "your work"; or
b. Your fulfilling the terms of the contract or agreement.
8. "Insured contract" means:
* * *
f. That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.
* * *
12. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.
14. "Products-completed operations hazard":
a. Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:
(1) Products that are still in your physical possession; or
(2) Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:
(a) When all of the work called for in your contract has been completed.
(b) When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.
(c) When that part of the work done at a job site has been put to its intended use by any *410 person or organization other than another contractor or subcontractor working on the same project.
Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.
b. Does not include "bodily injury" or "property damage" arising out of:
(1) The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured;
(2) The existence of tools, uninstalled equipment or abandoned or unused materials; or
(3) Products or operations for which the classification, listed in the Declarations or in a policy schedule, states that products completed operations are subject to the General Aggregate Limit.
15. "Property damage" means:
a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or
b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.
* * *
18. "Your product" means:
a. Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:
(1) You;
(2) Others trading under your name; or
(3) A person or organization whose business or assets you have acquired; and
b. Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.
"Your product" includes:
a. Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and
b. The providing of or failure to provide warnings or instructions.
"Your product" does not include vending machines or other property rented to or located for the use of others but not sold.
19. "Your work" means:
a. Work or operations performed by you or on your behalf; and
b. Materials, parts or equipment furnished in connection with such work or operations.
"Your work" includes:
a. Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and
b. The providing of or failure to provide warnings or instructions.
*411 COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY
1. Insuring Agreement
a. We will pay those sums that the insured become legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:
(1) The amount we will pay for damages is limited as described in LIMITS OF INSURANCE* (SECTION II); and
(2) Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A or B or medical expenses under Coverage C.
No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under SUPPLEMENTARY PAYMENTS  COVERAGES A AND B.
b. This insurance applies to "bodily injury" and "property damage" only if:
(1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory"; and
(2) The "bodily injury" or "property damage" occurs during the policy period.
*[The policy sets forth "LIMITS OF INSURANCE" as follows:
3. The Products-Completed Operations Aggregate Limit is the most we will pay under Coverage A for damages because of "bodily injury" and "property damage" included in the "products-completed operations hazard."]
2. Exclusions
This insurance does not apply to:
a. Expected or Intended Injury
"Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" or "property damage" resulting from the use of reasonable force to protect persons or property.
b. Contractual Liability
"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:
(1) That the insured would have in the absence of the contract or agreement; or
(2) Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed in an "insured contract", reasonable attorney fees and necessary litigation expenses incurred by or for a party other than an insured *412 are deemed to be damages because of "bodily injury" or "property damage", provided:
(a) Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract"; and
(b) Such attorney fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.
* * *
j. Damage to Property
"Property damage" to
(1) Property you own, rent, or occupy;
(2) Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises;
(3) Property loaned to you;
(4) Personal property in the care, custody or control of the insured;
(5) That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or
(6) That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.
Paragraph (2) of this exclusion does not apply if the premises are "your work" and were never occupied, rented or held for rental by you.
Paragraphs (3), (4), (5) and (6) of this exclusion do not apply to liability assumed under a sidetrack agreement. Paragraph (6) of this exclusion does not apply to "property damage" included in the products-completed operations hazard.
k. Damage to Your Product [as per applicable endorsement]
"Property damage" to that particular part of "your product" that is defective or actively malfunctions arising out of it or any part of it.
l. Damage to Your Work [as per applicable endorsement]
"Property damage" to that particular part of "your work" that is defective or actively malfunctions.
This exclusion applies only to the "products-completed operation" hazard. It does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.
m. Damage to Impaired Property or Property Not Physically Injured
"Property damage" to "impaired property" or property that has not been physically injured, arising out of:
(1) A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or
(2) A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.
This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.
n. Recall of Products, Work or Impaired Property

*413 Damages claimed for any loss, cost or expenses incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:
(1) "Your product";
(2) "Your work"; or
(3) "Impaired property";
If such product, work or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.
Exclusions c. through n. do not apply to damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner. A separate limit of insurance applies to this coverage as described in LIMITS OF INSURANCE (Section III).
PRODUCTS AND COMPLETED OPERATIONS EXTENSION ENDORSEMENT
It is agreed that, Products Completed Operations coverage is extended for a period of seven (7) years which will commence at the time the project is accepted by Owner. The products/completed operations limit is $4,000,000 each occurrence and $4,000,000 Aggregate for the extended completed operations period.
NOTES
[1] In a very recent case by the Wisconsin Supreme Court cited by the parties, this same language of the CGL policy was reviewed in a construction contract setting. Referencing the policy exclusions, the court concluded:

If, as [the insurer] contends, losses actionable in contract are never CGL "occurrences" for purposes of the initial coverage grant, then the business risk exclusions are entirely unnecessary.
American Family Mut. Ins. Co. v. American Girl, Inc., 268 Wis.2d 16, 673 N.W.2d 65, 78 (2004).